******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MICHAEL D.*
(AC 34624)

Beach, Bear and Sheldon, Js.**

*Argued April 9—officially released October 7, 2014*

(Appeal from Superior Court, judicial district of New
Haven, B. Fischer, J.)

*Alice Osedach*, assistant public defender, with whom,
on the brief, was *David Norman*, certified legal intern,
for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with
whom, on the brief, were *Michael Dearington*, state's
attorney, and *John P. Doyle, Jr.*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Michael D., appeals from the judgment of conviction rendered against him following a jury trial on two counts of risk of injury to a child, one in violation of subsection (1), and the other in violation of subsection (2), of General Statutes (Rev. to 2001) § 53-21.[1] On appeal, the defendant claims that the trial court erred by: (1) denying his motion to suppress the results of DNA testing of a suspected semen stain on a piece of the victim's clothing, which his ex-wife, the victim's mother, had turned over to the police several years after finding it hidden in his vehicle; (2) denying his motion in limine to preclude the introduction of a pornographic magazine that his ex-wife had also turned over to the police after finding it hidden, along with the victim's stained clothing, in his vehicle; and (3) allowing the case to proceed to trial and verdict on the state's duplicitous substitute information, thereby allegedly violating his constitutional right to a unanimous jury verdict. We reject each of the defendant's claims, and thus affirm the judgment of the trial court.

The following procedural history and facts are relevant to our resolution of the foregoing issues. The defendant and Ann P. were married in December, 1999. At the time of their marriage, Ann P. had a six year old daughter from a previous relationship, the victim. From 1999 until 2005, the defendant lived with his wife and the victim in Meriden. The state alleged that the defendant sexually assaulted the victim on three separate occasions between 2001 and 2003. The victim testified that the assaults had taken place at intervals of approximately one year, which she said she could recall on the basis of the passage of her birthdays.

The first incident allegedly occurred in 2001, when the victim was seven years old. She testified at trial that, on that occasion, the defendant entered her bedroom late at night, removed her pajamas and her underwear, put her in one of her dresses and applied makeup to her face using a lipstick she kept in her room for play. The defendant then placed her in her bed and began touching her vagina. The defendant ultimately penetrated her vagina digitally, causing her pain, then left the bedroom after warning her not to tell her mother what he had done. After he left the bedroom, the victim took off the dress and hung it up, then washed the makeup off her face with a napkin in the bathroom.

The second incident allegedly occurred in 2002, when the victim was eight years old. She testified that on that occasion, the defendant again entered her bedroom late at night, removed her pajamas and underwear, and dressed her in a different dress from her wardrobe. Then, she recalled, he removed his own shirt and shoes, and kissed her up and down her body before performing

cunnilingus on her. The victim testified that when she struggled to fight off the defendant and tried to hit him, he covered her mouth with his hand and pinned back her arm.

The third incident allegedly occurred in 2003, when the victim was nine years old. She testified that this incident also occurred in her bedroom late at night. This time, however, the defendant, who already was undressed when she first saw him, did not dress her up or put makeup on her. Instead, he immediately removed her clothing, including her underwear, and attempted to force her to submit to penile-vaginal intercourse with him. She testified that the defendant's "penis was touching [her vagina] and he was pushing . . . ." The defendant was able partially to insert his penis into her vagina. The victim recalled that, in an attempt to make the defendant stop, she kicked over an object in her room. The defendant thereafter left her bedroom.

In October, 2004, Ann P. became suspicious that the defendant was having an affair. Believing that she might find evidence of her husband's suspected infidelity, Ann P. searched the vehicle the defendant regularly drove, a quad cab vehicle she had purchased prior to the marriage, to which a second key was kept in the house.[2] Secreted in a small storage space behind the rear row of seats in the vehicle she found a plastic bag. Upon examining the contents of the bag, she discovered that it contained several articles of her daughter's outgrown clothing that she had previously set aside to take to Goodwill and two pornographic magazines: an unnamed adult fetish magazine and another magazine entitled "Barely Legal," in which young females were depicted in sexually suggestive settings and poses. Sensing that something was "really wrong," Ann P. took the bag out of the vehicle and hid it in her home where she thought the children would not find it. At some point, she went through the bag and discovered that some of her daughter's clothing felt "stiff" to the touch, which she attributed to the possible presence of semen. Shortly after discovering the bag and its contents, Ann P. filed for divorce. The divorce was finalized in February, 2005.

In the years following the divorce, Ann P. occasionally asked her daughter "in a roundabout way" whether "anybody [had] ever done anything" inappropriate to her. The victim did not disclose the alleged abuse to her mother until November, 2008, when they started discussing the possibility of her mother dating again. She disclosed at that time that the defendant had sexually assaulted her.

Shortly thereafter, Ann P. and her daughter filed a report with a school resource officer assigned to her daughter's school, who referred them to Detective Hector Cardona of the Meriden Police Department. Ann P.

accompanied her daughter to the police station to report the alleged abuse and her own earlier discovery of the bag and its contents in the defendant's vehicle. At the request of the investigating officers, Ann P. retrieved the bag from her home and turned it over to the police. Detective Cardona testified that he observed that one article of clothing in the bag had a "substance" on it that appeared "to be semen." Thereafter, the defendant was interviewed by the police. When the defendant was asked about the suspected semen stains on the victim's clothing, he told police that Ann P. had occasionally masturbated him onto clothing. He denied the victim's allegations of sexual assault and consented to giving a sample of his DNA by the taking of a buccal swab.

The defendant was arrested on the basis of the previously described evidence and the victim's statement to the police.[3] After a jury trial, the defendant was found guilty of two counts of risk of injury to a child. This appeal followed. Additional facts will be set forth as necessary.

The police subsequently sent the clothing with the suspected semen stain to the state forensic science laboratory for DNA analysis and testing. Testing on eight articles of clothing revealed the presence of the defendant's semen on one item of the victim's clothing: a pair of blue silk shorts, size six/seven.

Prior to trial, the defendant filed a motion to suppress the results of the DNA test. The defendant also filed a motion in limine to preclude evidence of the two pornographic magazines that Ann P. had found together with the victim's semen stained clothing in the bag in his vehicle. Following a hearing on the motions, the trial court denied the motion to suppress the results of the DNA testing. The court also denied the defendant's motion in limine to preclude evidence of his possession of the "Barely Legal" magazine that had been found together with the semen stained clothing.

Prior to trial, on January 13, 2012, the state filed a substitute information against the defendant, charging him as follows: in count one, with sexual assault in the first degree in violation of General Statutes § 53a-70; in count two, with risk of injury to a child in violation of § 53-21 (2); and in count three, with risk of injury to a child in violation of § 53-21 (1). Each such charge was based upon the defendant's alleged conduct in all three of the reported incidents that had led to his arrest. The defendant later was tried on these charges before a jury, which acquitted him of sexual assault in the first degree but found him guilty of both counts of risk of injury to a child. The trial court thereafter rendered judgment accordingly, sentencing the defendant to a total effective term of twenty years of incarceration, execution suspended after fourteen years, followed by fifteen years of probation, broken down as follows: on count two, on the charge of risk of injury to a child

in violation of § 53-21 (2), ten years of incarceration, execution suspended after seven years, followed by three years of probation; and on count three § 53-21 (1), a term of ten years of incarceration, execution suspended after seven years, followed by fifteen years of probation, to be served consecutively to the sentence on count two. The defendant appeals from that judgment. Additional facts will be set forth as necessary to review the defendant's claims.

I

The defendant first claims that the trial court improperly denied his motion to suppress the results of DNA testing performed on the victim's blue silk shorts which his ex-wife had found hidden in his vehicle and turned over to the police. Specifically, the defendant argues that his "expectation of privacy in the clothing items in his possession was manifestly clear," and therefore that the warrantless DNA testing of the shorts was unlawful under article first, § 7, of the Connecticut constitution, as interpreted and applied in *State* v. *Joyce*, 229 Conn. 10, 639 A.2d 1007 (1994), on appeal after remand, 243 Conn. 282, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). We disagree.

As a preliminary matter, we set forth the appropriate standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Citation omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008).

"The touchstone to determining whether a person has [the ability] to contest an allegedly illegal search is whether that person has a reasonable expectation of privacy in the invaded place. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . In order to meet this [threshold inquiry] . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the information searched]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances. . . . Furthermore, [t]he defendant bears the

burden of establishing the facts necessary to demonstrate a basis for standing . . . ." (Internal quotation marks omitted.) *State* v. *Kalphat*, 285 Conn. 367, 374–75, 939 A.2d 1165 (2008).

The following additional facts are relevant to our resolution of the defendant's claim. On January 17, 2012, the trial court held a hearing on the defendant's motion to suppress. For the purposes of the hearing, the parties stipulated to the following facts: "The girl's silk shorts on which contested DNA testing was performed were in a plastic bag in the defendant's motor vehicle. . . . The bag was taken from the defendant's motor vehicle by his ex-wife . . . [Ann P.] in 2004. . . . This bag was turned over to the . . . police department by [Ann P.] in 2009." At the defendant's request, the court also considered the factual averments set forth in the arrest warrant affidavit, which were consistent with, albeit more detailed than, those in the joint stipulation.[4]

According to the arrest warrant affidavit, in the fall of 2004, Ann P. discovered a plastic bag containing several articles of her daughter's clothing and two pornographic magazines concealed in the defendant's vehicle. Ann P. removed the bag from the vehicle. Following her daughter's disclosure of the sexual abuse in 2008, Ann P. transferred the bag to the Meriden police. She related to the police that some of the items appeared to be stained with semen. The defendant, who was later interviewed by the police, suggested that the victim's clothing was in his vehicle for the purpose of disposing of it. He attributed the suspected semen stains on the clothing to what he described as his ex-wife's past practice of using clothing to masturbate him. Even so, he denied having any specific recollection of the particular clothing at issue. The defendant voluntarily consented to the taking of a buccal swab to give the police a sample of his DNA.

On the basis of these facts and the arguments of counsel that were based upon them, the trial court denied the defendant's motion to suppress. The court concluded that the defendant did not have a reasonable expectation of privacy in the victim's clothing, and thus that he had no right to challenge the testing of the clothing as an unreasonable search under *State* v. *Joyce*, supra, 229 Conn. 10.

The defendant argues on appeal that he manifested a clear expectation of privacy in the tested clothing, as evidenced by his concealment of the clothing in the bag in his vehicle. He further claims that he had a "reasonable expectation of privacy in the myriad personal facts that could be—and indeed were—revealed by [the] DNA testing of the clothing items." The defendant's reliance on *Joyce* is misplaced.

The issue in *Joyce* was whether chemical analysis, specifically, gas chromatography performed on the

defendant's clothing while it was lawfully in the possession of the police, required a warrant under our state constitution. *State* v. *Joyce*, supra, 229 Conn. 11. In that case, firefighters and paramedics were dispatched on reports of a fire in East Haven. Id., 12. When emergency crews arrived, they found a home on fire and Wallace Joyce, the defendant, standing waist deep in a nearby river, badly burned. Id. Paramedics at the scene removed Joyce's clothing to clean and dress his burns, and then transported him to a nearby hospital for emergency medical treatment. Id., 12–13. Detectives took possession of Joyce's burned wet clothing at the scene with the intention of returning it to him. Id., 14.

During the course of the investigation that followed, Joyce made statements to the detectives that caused them to consider him a potential suspect in the starting of the fire. Without first obtaining a warrant, investigators sent Joyce's clothing to the state forensic laboratory for chemical testing, which revealed that the clothing contained a gas accelerant. Id., 14–15.

On appeal, our Supreme Court determined that the warrantless chemical testing had been conducted in violation of the state constitution, and thus that the results of such testing should have been suppressed. Id., 27. The court's analysis assumed, without objection by the state, that the defendant had a right to challenge the testing of his seized clothing because "generally there is a reasonable expectation of privacy *in the clothes that one wears*." (Emphasis added.) Id., 21. In the case before it, moreover, the court noted that the type of testing to which the clothing had been subjected was not only "capable of determining a multitude of private facts about an individual"; id., 24; but had in fact revealed "a multitude of private facts" about the defendant, including the "presence of an organic material in [his] underwear . . . ." Id. Finding that the conduct of such intrusive testing constituted a search under our state constitution, which "mere custody of the defendant's property"; id., 21; did not entitle the police to make without further legal authorization, the court ruled that the results of such testing without a warrant had to be suppressed. Id., 27.

In *State* v. *Bernier*, 246 Conn. 63, 717 A.2d 652 (1998), our Supreme Court clarified its holding in *Joyce*. *Bernier* was an arson case in which the defendant sought to suppress the results of warrantless chemical testing of certain charred wood flooring samples that state fire investigators had seized from his home to assist them in conducting a cause and origin investigation with respect to the fire. The trial court had ordered suppression of the results of the testing under *Joyce*. On appeal, this court affirmed the granting of the motion to dismiss, and our Supreme Court then reversed the judgment, distinguishing *Joyce* as follows. Whereas the clothing in *Joyce* had been seized by police for limited, nonin-

vestigative purposes pursuant to their community caretaking function, the flooring in *Bernier* had been seized by fire officials pursuant to the statutory scheme expressly authorizing such seizures for the broader purpose of investigating the causes and origins of fires. Id., 76; see also id., 66–67 and 68–69 n.6 (discussing General Statutes §§ 29-302, 29-310 and 29-311). The court in *Bernier* thus reasoned that, even if a defendant has a reasonable expectation of privacy in the contents of his personal property, "[o]nce [that] property has been legitimately seized for investigatory purposes, the major portion of his privacy expectations has been legitimately breached," thereby eliminating the need for a warrant before subjecting the property to further intrusions such as chemical analysis. Id.

We read *Joyce* and *Bernier* together to hold that where, as in *Joyce*, property is seized by the police under limited authority not justifying its submission for laboratory testing and analysis, the performance of such testing and analysis on it is a search that requires further legal authorization, under a warrant or a statute, or further legal justification under an established exception to the warrant requirement, if and to the extent that the defendant has a reasonable expectation of privacy in the seized property or its contents that the testing and analysis will reveal. Where, however, items are lawfully seized for the purposes of investigation, including, potentially, chemical testing, any preexisting expectation of privacy in those aspects of the property or its contents that can only be revealed by such chemical testing is already "legitimately breached" to the extent that no further authorization or justification for such testing is required, by warrant or otherwise.

In the present case, the trial court ruled that the defendant could not avail himself of the constitutional protections delineated in *Joyce* because the clothing in which he claimed a reasonable expectation of privacy, unlike the undergarments tested in *Joyce*, belonged to and had been worn only by the child victim, not by the defendant himself. Hence, he could not claim, as had the defendant in *Joyce*, that he had worn the clothing in such a manner as to make it likely that it became a repository of organic material potentially revealing highly private facts about him.

Under the reasoning of *Joyce* and *Bernier*, it was therefore the defendant's burden to show that he had some alternative basis for establishing that he had a reasonable expectation of privacy in the *victim's clothing* even after his ex-wife turned the clothing over to the police. Having failed to testify or adduce other evidence at the suppression hearing to prove how he used the clothing or stored it in an effort to keep it private, he failed to establish any basis for having an expectation of privacy with respect to it, and accordingly, the trial court properly denied his motion to suppress.

The defendant has attempted to analogize his case to *Joyce*, arguing that because the seized clothing was kept hidden in a bag in his vehicle, and it was claimed by the state to contain his semen, suggesting that he may have used it to engage in the private activity of masturbation, he had a reasonable expectation of privacy both in the clothing itself and in the "invisible information present [there]in." The defendant thus claims that *Joyce* applies here, despite the fact that the clothing at issue once belonged to and was worn by the victim instead of him.

The initial problem with this contention is that, although the evidence before the trial court made that theory possible, the defendant never testified in support of it, and in fact contradicted it when he was confronted with the bag and its contents during his interview with the police after his ex-wife turned it over to them. The defendant thus denied taking the victim's clothing for sexual purposes, suggested that the clothing may have been in his vehicle because he intended to discard it, and surmised that any semen present on it may have been deposited when Ann P. used it to masturbate him. In short, the defendant failed to commit himself to the theory he now espouses, that he intentionally retained the stained clothing in a private place for his private sexual purposes.

The right of privacy is personal to the party seeking to invoke it, and thus cannot be left to the court's speculation. It was the defendant's burden to adduce specific facts to show that he manifested a subjective expectation of privacy in the victim's clothing and that that expectation of privacy was reasonable. He failed to do so.

Moreover, even if the defendant had produced evidence demonstrating that he once had a personal expectation of privacy in the victim's clothing, any such expectation of privacy was "legitimately breached" once the police lawfully took possession of it with his ex-wife's consent. See *State* v. *Bernier,* supra, 246 Conn. 76. It was undisputed that Ann P. took the bag containing her daughter's clothing out of the defendant's vehicle in 2004 and kept it in her possession for more than four years before turning it over to the police. The facts further demonstrate that Ann P. acquiesced in the police request to turn the clothing over to them with her full consent to take whatever investigative measures they deemed appropriate thereafter, including, inferentially, submitting it for laboratory testing to confirm her stated suspicion that the visible stain she had found on the clothing was the defendant's semen.

"A search is not unreasonable . . . if a person with authority to do so has voluntarily consented to the search." (Internal quotation marks omitted.) *State* v. *Brunetti,* 279 Conn. 39, 69, 901 A.2d 1 (2006), cert.

denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Ann P.'s consent to surrender the tested clothing to the police, which has never been challenged by the defendant, operated, like the cause and origin statute in *Bernier*; see *State* v. *Bernier*, supra, 246 Conn. 68 n.6; to authorize the police to test the clothing for any evidence they might find relating to the commission of the crimes under investigation.[5]

In light of these conclusions, the defendant's claim that the results of the DNA testing should have been suppressed as fruit of an unlawful warrantless search is unavailing. Not only did the defendant not establish that he had a reasonable expectation of privacy in the victim's semen stained clothing, but the state had full authority to conduct the challenged testing notwithstanding any such expectation of privacy pursuant to Ann P.'s consent. See id., 76 (intrusion by state had already occurred when officials legitimately took possession of flooring sample in defendant's home). Accordingly, we conclude that the trial court did not err by denying the defendant's motion to suppress.

II

We next address the defendant's claim that the trial court erred in denying the defendant's motion in limine to preclude evidence regarding his possession of the pornographic magazine, "Barely Legal." The defendant makes three interrelated claims within his larger claim, as follows: (1) that evidence pertaining to the magazine was not relevant to the jury's determination of the charged offenses; (2) that the magazine constituted inadmissible character and propensity evidence; and (3) that, even assuming that the evidence was relevant, its negligible probative value was outweighed by its prejudicial impact. We disagree.

The following additional facts are relevant to our resolution of this claim. Prior to trial, the defendant filed a motion in limine to preclude all evidence relating to the pornographic magazine.[6] The state subsequently filed a notice of intent and uncharged misconduct, confirming that it would seek to introduce the magazine because it was "relevant to motive, intent, common scheme," and to "show the defendant's inclination or sexual attraction to the minor child in this matter."

An evidentiary hearing was held on the defendant's motion to preclude the evidence. Over the course of two days, the court heard testimony from an expert witness, Dennis Gibeau, a licensed clinical psychologist specializing in the assessment and treatment of sex offenders, and from Ann P.

Gibeau testified that "Barely Legal" is a legally sold and widely distributed pornographic magazine. The magazine "depicts younger adult females in youthful poses, youthful appearance, youthful clothing, sometimes with shaved or partially shaved pubic area,

emphasizing their innocence, their vulnerability, and their sexual inexperience." The photographs in the magazine are accompanied by profiles suggesting that the women are seeking to "explore more sexual avenues with older men."

Much of Gibeau's testimony focused on the distinction between the physical and sexual characteristics of prepubescent girls and those of postpubescent females older than age thirteen, who have "secondary sexual characteristics, breasts, hair, [and] the body filling out . . . ." Gibeau posited that it would be speculative to connect possession of "Barely Legal," which features postpubescent females, with a sexual interest in prepubescent girls. In his estimation, the women in the magazine were not attempting to portray or invoke images of girls age seven, eight or nine.

The trial court questioned Gibeau at length as to the significance of the fact that the magazine was discovered in a bag that also contained the victim's semen stained clothing. Upon further questioning by the prosecution, also focusing on the commingling of the pornographic magazines and the victim's clothing in the bag, Gibeau conceded that one could "clinically infer" that these items tended to demonstrate that the defendant had a sexual interest in the victim. On redirect, he clarified that the items raised a "suspicion" but could not support a clinical conclusion regarding the defendant's interest in the victim.

Ann P. also testified at the motions hearing. She confirmed that she had discovered the bag hidden in the defendant's vehicle in October, 2004, the year following the third alleged assault. She testified that the bag contained her daughter's outgrown clothing, including a garment she recognized as belonging to her daughter; "some silk PJs" that "she used to wear to bed or as underwear;" and pornographic magazines, including a copy of "Barely Legal."

In support of the defendant's motion to preclude the evidence, defense counsel argued that possession of the magazine did not qualify as "uncharged misconduct," and thus it would be error for the court to allow the evidence under one of the exceptions delineated in § 4-5 of the Connecticut Code of Evidence. Additionally, defense counsel argued that because possession of the magazine was not connected to the charges against the defendant, it was not relevant. Finally, defense counsel emphasized that the defendant's interest in sexually mature women, such as those featured in the magazine, could not form the basis for a reasonable inference that he was sexually attracted to children, or thus to the victim.

The state conceded that the evidence did not constitute uncharged misconduct. It maintained, however, that the evidence demonstrated "the defendant's sexual

attractiveness to his stepdaughter," and thus it was probative of his motive and intent to commit the crimes. Additionally, the state argued that in a "he-said-she-said" situation of the sort here at issue, the evidence served to corroborate the victim's testimony.

The trial court denied the defendant's motion in limine to preclude the evidence and made factual findings on the record in support of its ruling. On that subject it stated, inter alia: " 'Barely Legal' is a magazine that emphasizes the following: It shows young girls, maybe mid- or late teens, in youthful sexual settings and emphasizes the vulnerability of the young girls. It has young girls in outfits worn to show their vulnerability. It indicates it has pictures of females wanting to explore relationships with men, and, as the witness testified yesterday, it actually depicted girls that appear or try to appear younger than eighteen. The magazine's purpose is to stimulate older [men] concerning younger girls.

"Now, the issue here that I wanted to clear up today, it's not like we have "Barely Legal" magazine at the defendant's office or he was looking at it at a friend's house, and it's not like the clothing that was worn by the [victim] here was found in a different area of the house or in another family member's house or that semen was not connected. We have, in effect, three items within the same plastic bag, which [are] the clothing items worn by the [victim]. There's not a claim that they're worn by the [victim] during the alleged sexual assault. The allegations of the state [are] that this defendant did have this young girl, the [victim], dress in a certain way prior to the sexual assaults that allegedly happened. So, the clothing of the young [victim] was found within this plastic bag. A clothing item of this young girl, the [victim] here, had semen of the defendant on it. In addition, the magazine "Barely Legal" was all found. So, all three of these items were in the defendant's car, all in the same place.

"The magazine 'Barely Legal' tends to establish the fact of the defendant's interest in young girls. The magazine in this court's estimation is probative of the fact that the defendant regards young girls as objects of sexual interest and is thus relevant to the charges against him." Defense counsel requested that the trial court articulate whether it weighed the relevance of the magazine against potential prejudice to the defendant, to which the court responded in the affirmative.[7] The jury heard testimonial evidence pertaining to the defendant's possession of the magazine. In addition, the magazine went to the jury as a full exhibit.[8]

The defendant argues on appeal that the trial court erred in denying the motion in limine to preclude evidence of the magazine. Consistent with the arguments advanced before the trial court, the defendant now argues that the evidence was irrelevant, that it consti-

tuted improper character and propensity evidence, and that even if it was relevant, its probative value was outweighed by the danger of unfair prejudice. We disagree.

We first set forth the appropriate standard of review. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 774, 970 A.2d 108 (2009).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. In a criminal case, the allegations forming the basis of the charges in the information determine the material issues at trial. "[E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Internal quotation marks omitted.) *Jewett* v. *Jewett*, 265 Conn. 669, 679–80, 830 A.2d 193 (2003). "No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience." (Internal quotation marks omitted.) *State* v. *Anwar S.*, 141 Conn. App. 355, 375, 61 A.3d 1129, cert. denied, 308 Conn. 936, 66 A.3d 499 (2013).

The defendant argues that "[t]he only inference to be made from the magazine is that the defendant had a sexual interest in young-looking postpubescent adult women—a fact utterly irrelevant to the material factual issues in the case." This is an oversimplification in light of the facts of this case.

Here, the state alleged that the defendant sexually assaulted the victim in 2001, 2002, and 2003, several years before she disclosed the sexual abuse to the police. Any evidence tending to show that the defendant had a sexual interest in the victim was relevant to the central question before the jury, which was whether or not the defendant actually touched or assaulted the victim in the manner alleged.

The testimony at trial established that in 2004, the year following the third alleged sexual assault, Ann P. discovered the pornographic magazine and her daughter's outgrown clothing, together, in a bag secreted in the defendant's vehicle. One item of clothing, the pair of blue silk shorts, was soiled with the defendant's semen. The packaging of these items together, and the fact that they were hidden, supports a reasonable inference that the defendant viewed the pornographic magazine while masturbating with the victim's clothing. This evidence permitted a finding that the defendant had a sexual interest in the victim and motivation to commit the alleged crimes. Accord *Phillips* v. *State*, 269 Ga. App. 619, 620, 604 S.E.2d 520 (2004) (defendant's sexual interest in complainant, and thus his motivation to touch her sexually, was supported by evidence that he kept nude photographs of complainant between pages of "Barely Legal" magazine), petition for certification dismissed, 2006 Ga. LEXIS 942 (Ga. November 6, 2006).

In addition to the connection between the magazine and the victim's semen stained clothing, there was other evidence from which to infer that the incidents that allegedly transpired between the defendant and the victim mimicked the fantasies depicted in the magazine. The victim alleged that in two of the three incidents, the defendant dressed her up prior to sexually assaulting her; on one of these occasions, he also applied makeup to her face. The trial court's factual findings about "Barely Legal" were that it features "young girls in outfits worn to show their vulnerability" and it "depict[s] girls that appear or try to appear younger than eighteen." In addition, the trial court found that the "magazine's purpose is to stimulate older [men] concerning younger girls." Putting the defendant's prepubescent/postpubescent distinction aside, the evidence supported an inference that the defendant fantasized about young women in child-like scenarios.[9] The victim's testimony suggested that she was dressed up and adorned so as to appear more adult. In other words, she was put in a situation that made her appear like the young females depicted in the Barely Legal magazine, where she was cast in the role of a vulnerable young lady, attractive as a sexual object to an older man.

The evidence and testimony at trial suggests that the magazine was supportive of this inference because of its specific connection to the victim's semen stained clothing and because of the similarity between the fantasies depicted in it and the alleged incidents as described by the victim. Evidence that the defendant possessed the magazine with the victim's clothing was admissible to show that he had a sexual interest in her. See *State* v. *James*, 211 Conn. 555, 577–78, 560 A.2d 426 (1989) (defendant's prior conduct toward complainant admissible to show he was especially attracted to her). Accordingly, we conclude that the trial court properly

deemed the evidence relevant to the jury's determination in this case.

The defendant next claims that the court erred in denying his motion in limine because his possession of the magazine was tantamount to improper character and propensity evidence and thus should have been precluded.[10] We disagree. Section 4-4 of the Connecticut Code of Evidence prohibits the use of evidence of the defendant's trait of character for purposes of proving that he "acted in conformity with the character trait on a particular occasion . . . ." Conn. Code Evid. § 4-4 (a). Likewise, § 4-5 of the Connecticut Code of Evidence prohibits specific instances of conduct, i.e., evidence of other crimes, wrongs, or acts of a person, to prove the criminal tendencies of that person, subject to certain limited exceptions. See also *State* v. *Holliday*, 159 Conn. 169, 172, 268 A.2d 368 (1970) (admission of evidence of conduct on part of defendant indicating consciousness of guilt). The rules barring the use of propensity evidence, either in the form of general character traits or specific instances of conduct, are predicated on eliminating the risk that the jury will decide present facts on the basis of the defendant's past behavior; this is so because of both the risk of unfairness to the defendant and the general understanding that forecasting future behavior on the basis of past conduct is inherently unreliable. C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 4.12.2, p. 166.

The record reflects that these concerns were not implicated in the present case. "[T]he inadmissibility of an evidential fact for one purpose does not render it inadmissible for some other purpose otherwise proper." *State* v. *Marshall*, 166 Conn. 593, 600, 353 A.2d 756 (1974). The parties agreed that possession of the magazine did not constitute evidence of prior misconduct under § 4-5 of the Connecticut Code of Evidence. In fact, the state acknowledged the publication's legality in its closing argument. Because we decide that the trial court did not err in determining that the evidence was relevant, we decline the defendant's invitation to disturb the trial court's conclusion that potential prejudice to the defendant did not outweigh that magazine's probative value. "[T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court . . . and is subject to reversal only [when] an abuse of discretion is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Rinaldi*, 220 Conn. 345, 355, 599 A.2d 1 (1991). "[U]ndue prejudice is not measured by the significance of the evidence which is relevant *but by the impact of that which is extraneous*." (Emphasis added; internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 564, 958 A.2d 1214 (2008). Here, as previously noted, the evidence relating to the magazine was relevant to show the defendant's sexual interest in the victim. The record

clearly reflects that the trial court carefully balanced the probative value of the evidence on that issue against any undue prejudice potentially arising therefrom. The trial court did not abuse its discretion in admitting the evidence.[11]

### III

The defendant's final claim is that the state's substitute information was impermissibly duplicitous, and thus, that allowing his jury to find him guilty thereunder deprived him of his constitutional right to a unanimous jury verdict. Specifically, the defendant contends that "[b]y charging three separate and factually distinct incidents under one count, there is a substantial possibility that the jury did not agree on the same factual basis for conviction." We are not persuaded.

The state based each of its charges on three separate incidents of sexual misconduct allegedly occurring in 2001, 2002, and 2003. The state initially charged the defendant in a fifteen count information with several different charges, each of which was alleged to have been committed in the course of one of the three incidents identified therein by the year of its alleged occurrence. Prior to trial, on January 13, 2012, the state filed a substitute information, consolidating the fifteen counts into the three counts on which he went to trial.

In the first count of the substitute information, the state charged the defendant with sexual assault in the first degree. In the second count of the substitute information, the state charged the defendant with risk of injury to a child, and alleged that "on . . . diverse dates from 2001–2003 . . . the [defendant] had contact with the intimate parts, as defined in [General Statutes §] 53a-65, of a child under the age of sixteen years or subjected a child under sixteen years of age to contact with intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child, said conduct being in violation of section 53-21 (2) of the Connecticut General Statutes."

In the third count, the state charged the defendant with risk of injury to a child, and alleged that "on . . . diverse dates from 2001–2003 . . . the [defendant] did wilfully or unlawfully cause or permit a child under the age of sixteen years to be placed in such a situation that its life or limb was endangered, or its health was likely to be injured, or its morals likely to be impaired, or did an act likely to impair the health or morals of such child, such conduct being in violation of section 53-21 (1) of the Connecticut General Statutes."

The defendant asserts that the state's decision to charge him on the basis of three separate and distinct incidents in each count of the substitute information posed the risk that the jury would find him guilty of those charges without unanimously agreeing on the particular conduct constituting the charged offense.

The defendant claims that the state's rebuttal argument, in which it invited the jury to find him guilty as charged if it found that "*any one* of these particular incidents occurred, *all of them or any one of them*," further amplified the risk that the jury failed to agree on the conduct underlying the crimes charged, but nonetheless found the defendant guilty of those crimes. (Emphasis added.)

As a preliminary matter, the defendant concedes that he did not object to the substitute information at trial as duplicitous or as implicating his constitutional right to a unanimous verdict. Accordingly, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[12] Under *Golding*, a "defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis omitted; footnote omitted.) Id.

We will review the defendant's claim because we agree that the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Marcelino S.*, 118 Conn. App. 589, 594, 984 A.2d 1148 (2009), cert. denied, 295 Conn. 904, 988 A.2d 879 (2010). We conclude, however, that the relevant facts do not suggest that the defendant was prejudiced by the allegedly duplicitous information, and thus that his claim fails under the third prong of *Golding*.

"Duplicity occurs when two or more offenses are charged in a single count of the accusatory instrument." (Internal quotation marks omitted.) *State* v. *Browne*, 84 Conn. App. 351, 381, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004); see also *State* v. *Marcelino S.*, supra, 118 Conn. App. 594. "It is now generally recognized that [a] single count is not duplicitous merely because it contains several allegations that could have been stated as separate offenses. . . . Rather, such a count is only duplicitous where the policy considerations underlying the doctrine are implicated. . . . These [considerations] include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution." (Internal quotation marks omitted.) *State* v. *Marcelino S.*, supra, 594–95.

The unanimity requirement mandates that the jury agree on the factual basis of the charge. See, e.g., *State v. Benite*, 6 Conn. App. 667, 675, 507 A.2d 478 (1986) ("[t]he determination of whether actions are conceptually distinct must be made with reference to the purpose behind the proposed charge: to ensure that the jurors are in unanimous agreement as to what conduct the defendant committed"). The defendant argues that the state's "unusual charging method" presents a concern that the jury did not unanimously agree on the acts or conduct underlying the conviction. The defendant suggests that because the consolidated counts of the substituted information were premised on separate and distinct incidents, some jurors may have credited the victim's testimony as to one act, but not all, whereas other jurors may have credited her testimony as to other acts, thereby giving rise to concerns that the jury's verdict was not unanimous.

The state argues that this case turned on the victim's credibility, and that the defendant did not "present a particularized challenge to any of the individual incidents of sexual assault . . . ." Therefore, the state argues, any risk that the jury considered the individual acts constituting the crime and did not agree simply does not arise. We agree with the state. The record reflects that the question of the victim's credibility was front and center throughout the trial. The defendant took particular aim at the victim's testimony in closing argument, where he repeatedly suggested that she was not believable, and that she had manufactured her testimony. The defendant implored the jury to consider the question of his guilt, mindful that his fate ultimately came down to the victim's word: "She's their case. You have to believe her in order to convict him."

Moreover, the "three separate and factually distinct incidents" that the defendant now claims on appeal posed a great risk of a nonunanimous verdict were highlighted in the defendant's argument as parts of a single course of conduct, as follows: "She wants you to believe that this happened like clockwork, once a year. Every year for three years, once a year he came into her room in the middle of the night. Isn't that odd?" And again, the defendant urged the jury to consider that "she made three very specific allegations."

As the defendant argued to the jury, the state's case rested on the victim's testimony. "[T]he primary decision for the jury was whether [the victim] should be believed." *State* v. *Marcelino S.*, supra, 118 Conn. App. 597. He cannot now argue, convincingly, that the jury reviewed his case and the evidence, and arrived at a verdict without unanimously agreeing on the factual basis for it. In a case such as this, the "spectre of lack of unanimity cannot arise." *State* v. *Saraceno*, 15 Conn. App. 222, 230, 545 A.2d 1116, cert. denied, 209 Conn. 823, 824, 552 A.2d 431, 432 (1988).

We similarly reject the defendant's contention that the risk of a nonunanimous jury verdict is of "acute concern" here because the jury delivered a mixed verdict, finding the defendant guilty of risk of injury but acquitting him of sexual assault. The record reflects that the jury deliberated for three days, during which it requested and heard playback testimony of Ann P. and the victim. Moreover, the court's charge detailed the unanimity requirement, stating that "[e]ach count alleges a separate crime" to be considered "separately in deciding the guilt or nonguilt of the defendant." The court continued: "[I]f you find that the state has proven beyond a reasonable doubt all of the elements of a crime, then you must find the defendant guilty of that crime. On the other hand, if you find that the state has failed to prove beyond a reasonable doubt any one of the elements of a crime, you must find the defendant not guilty of that crime." The court further cautioned that "there is no principle of law for less than a unanimous verdict." It is well settled that "[t]he jury is presumed, in the absence of a fair indication to the contrary, to have followed the court's instruction as to the law." (Internal quotation marks omitted.) *State* v. *Jennings*, 216 Conn. 647, 664, 583 A.2d 915 (1990). The record suggests that the jury considered the evidence in an assiduous fashion guided by the court's correct instructions on the law. Accordingly, we decline to impute nonunanimity to the jury's verdict because it chose, after careful deliberation, to acquit on the charge of sexual assault.

"[W]e are ever mindful that the defendant is entitled to be protected against the danger that . . . he will be convicted not on the basis of one unanimous verdict on a single set of facts but under juror votes of conviction which, depending on the particular member of the jury, relate to entirely different [occasions] . . . ." (Internal quotation marks omitted.) *State* v. *Saraceno*, supra, 15 Conn. App. 230. Here, however, there was no risk that the jury's verdict was not unanimous. The central question for the jury was whether the victim should be believed. The jury considered that question, at length, against the backdrop of the defendant's argument, impugning the victim's credibility, and imploring the jurors to discredit her testimony as to all of the reported incidents, not just some. We conclude, therefore, on the basis of the evidence presented at trial and the relevant facts, that the defendant was not prejudiced as a result of the duplicitous substitute information.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 53-21 has since been revised and the subsections retitled.

[2] Although Ann P. was title owner of the vehicle, the parties stipulated that the defendant regularly drove the car. We therefore refer to it as his vehicle in this opinion.

[3] The state initially charged the defendant in a fifteen count information with several different charges that were based on his alleged conduct in the three reported incidents. Each count was based specifically on one of the three incidents, which was identified in the count by the year of its alleged occurrence.

[4] Defense counsel represented to the court that they were "proceed[ing] expecting that's the evidence."

[5] Again we note that the undisputed facts show that the clothing was in the possession of Ann P. for more than four years before it was transferred to the police. The record is devoid of any facts suggesting that the defendant made any attempt to seek the clothing out or reclaim the clothing during that time.

[6] The defendant's motion also sought to preclude evidence of the unnamed adult fetish magazine discovered in the vehicle. There was no testimony or evidence pertaining to the adult fetish magazine presented at the hearing on the defendant's motion. When, however, the state represented to the trial court that it would not offer the adult fetish magazine in evidence, the trial court granted the defendant's motion to preclude it from evidence on that basis.

[7] The court did not examine the contents of the magazines personally in making this determination, but relied instead on the testimony of Gibeau, the expert witness. Defense counsel also requested that the court articulate whether it considered Gibeau's testimony in deciding that the magazine was probative of the defendant's interest in young girls. The state objected on the ground that the court had set forth its reasons for admitting the evidence in its ruling, and the court declined to articulate further.

[8] There was no request for a limiting instruction to the jury.

[9] By way of example, Gibeau testified to one particular profile in the magazine advertising that the young woman "still wet the bed . . . ."

[10] The state argues that the defendant waived this claim. Specifically, the state argues that the defendant expressly stated to the court, "I don't think it's uncharged misconduct [evidence], and I wouldn't want to spend three pages arguing about that . . . ." Pursuant to our review of the record, defense counsel consistently maintained that the evidence was inadmissible under either §§ 4-4 or 4-5 of the Connecticut Code of Evidence and, accordingly, his claim is preserved.

[11] Because we uphold the trial court's ruling, we have no occasion to consider the defendant's further claim that the admission of the magazine was so prejudicial that it deprived him of a fair trial.

[12] The state argues that the defendant cannot invoke *Golding* review because he waived his claim by failing to seek a bill of particulars. The state directs our attention to *State* v. *Bazemore*, 107 Conn. App. 441, 454–55, 945 A.2d 987, cert. denied, 287 Conn. 923, 951 A.2d 573 (2008), in which we concluded that the defendant, who claimed he was deprived of his constitutional right to fair notice of the charges against him, waived his claim by failing to request a bill of particulars. Pursuant to our finding waiver, we concluded that we would not entertain the defendant's claim on appeal under *Golding*. The state acknowledges, however, that in *State* v. *Marcelino S.*, 118 Conn. App. 589, 594, 984 A.2d 1148 (2009), cert. denied, 295 Conn. 904, 988 A.2d 879 (2010), we applied *Golding* review to the defendant's unpreserved claim that the duplicitous information deprived him of his constitutional right to a unanimous jury verdict. We are bound by our decision in *Marcelino S.*, and therefore, we apply *Golding* to the defendant's unanimity claim here.